**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **ANTHONY JAMES BIRGE,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No.  3:12-CV-1777-G (BH)** |
| | § | |
| **CAROLYN W. COLVIN, ACTING** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | **Referred to U.S. Magistrate Judge** |

<u>**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**</u>

Pursuant to *Special Order No. 3-251*, this case was automatically referred for proposed findings of fact and recommendation for disposition.  Before the Court are *Plaintiff's Motion for Summary Judgment*, filed September 19, 2012 (doc. 9), and *Defendant's Motion for Summary Judgment*, filed October 19, 2012 (doc. 10).  Based on the relevant filings, evidence, and applicable law, Plaintiff's motion should be **GRANTED** in part, Defendant's motion should be **DENIED**, and the case should be **REMANDED** to the Commissioner for further proceedings.

## I.  BACKGROUND[1]

### A.  <u>Procedural History</u>

Anthony James Birge (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claims for Disability Insurance Benefits (DIB) and Supplementary Security Income (SSI) under Titles II and XVI of the Social

---

[1] The background comes from the transcript of the administrative proceedings, which is designated as "R."

Security Act.  (R. at 1–3.)  He applied for DBI and SSI on August 24, 2010, alleging disability beginning August 6, 2010, due to depression and bipolar disorder.  (R. at 136–49, 181.)  His claims were denied initially and upon reconsideration.  (R. at 73–80, 85–90.)  He requested a hearing before an Administrative Law Judge (ALJ), and one was held on June 9, 2011.  (R. at 24–68.)  On July 29, 2011, the ALJ issued his decision finding Plaintiff not disabled.  (R. at 13–23.)  The Appeals Council denied his request for review on April 11, 2012, making the ALJ's decision the final decision of the Commissioner.  (R. at 1–3.) He appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g).  (doc. 1.)

**B.** **Factual History**

      **1.** **Age, Education, and Work Experience**

Plaintiff was born on October 12, 1977; he was 33 at the time of the hearing before the ALJ. (R. at 136.)  He completed the 12th grade, attended vocational school to learn welding, and has past relevant work as a welder, equipment rental clerk, and transloader. (R. at 44, 61.)

      **2.** **Psychological and Psychiatric Evidence**

On July 22, 2010, Plaintiff underwent an initial psychological assessment at Pecan Valley Center for Mental Health and Mental Retardation (MHMR).  (R. at 235, 270–84.)  Plaintiff told Jan Walker, the intake coordinator, that he was diagnosed with bipolar disorder as a teenager but had not taken medication since then.  (R. at 270.)  On a 7-point scale, with 7 being "extremely severe," Ms. Walker rated his manic symptoms (i.e., hostility, elevated mood, grandiosity, excitement, and psychomotor hyperactivity) between 5 and 7.  (R. at 276.)  She rated his depressive symptoms (i.e., depressed mood, anxiety, emotional withdrawal, and blunted affect) between 6 and 7.  (*Id.*)  His emotions, thought processes, and thought content were "within normal limits", and his speech was

slow and monotone.  (R. at 277.)  Plaintiff told her that he was committed in 1997 "for anger issues." (R. at 270.)  When angry, he was aggressive and threw and broke things.  (*Id.*)  Ms. Walker diagnosed him with bipolar disorder I, manic, severe, without psychotic features, and assigned him a Global Assessment of Functioning (GAF) score of 44.[2]  (R. at 278.)

The following week, Plaintiff saw Jennie Muchai, a qualified mental health professional (QMHP) at MHMR, for a therapy session about anger management.  (R. at 269.)  His wife told Ms. Muchai that he "was angry all the time and really needed help with problem solving skills."  (*Id.*) During a subsequent session on August 13, 2010, Ms. Muchai noted that Plaintiff "responded positively to [the] training."  (R. at 266.)  The next week, Plaintiff told Ms. Muchai that "he had a really tough up bringing [and] getting angry [was] all [he] knew ... to resolve conflict."  (R. at 265.)

On August 20, 2010, Plaintiff saw Arunachalam Thiruvengadam, M.D., a psychiatrist at MHMR, for an initial evaluation.  (R. at 263–64.)  Dr. Thiruvengadam found that Plaintiff appeared neat and clean, his affect and speech were normal, and his mood was euthymic.  (R. at 263.)  On a 10-point scale, he rated Plaintiff's manic symptoms at 4; his depression symptoms at 0; his level of interest, energy, and insomnia at 7; and his overall level of functioning at 7.  (R. at 264.)  He diagnosed Plaintiff with bipolar disorder without psychotic features.  (R. at 263.)

Plaintiff saw Ms. Muchai four times in September 2010.  (R. at 260–61, 325, 341.)  On September 10, 2010, she opined that Plaintiff was "making little progress" managing his anger.  (R. at 260.)  On September 13, 2010, he requested a different medication because his current prescriptions were "giving him many side effects."  (R. at 325.)

---

[2]   GAF is a standardized measure of psychological, social, and occupational functioning used in assessing a patient's mental health.  *Boyd v. Apfel*, 239 F.3d 698, 700 n. 2 (5th Cir. 2001).  A GAF score of 41 to 50 indicates serious symptoms, such as suicidal ideations and severe obsessional rituals, or any serious impairment in social, occupational, or school functioning, such as having no friends or being unable to keep a job.  *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 34 (4th ed., text rev. 2000).

On October 1, 2010, Plaintiff told Dr. Thiruvengadam that he felt angry "a lot" and stayed away from people to avoid confrontation. (R. at 258.) He reported being mildly depressed and sleeping poorly. (*Id.*) Dr. Thiruvengadam found that his affect and speech were normal, his mood was depressed, and his thoughts were logical and coherent. (*Id.*) He rated Plaintiff's symptoms of mania, depression, irritability, mood lability, and agitation at 3, and his levels of interest, appetite, energy, and overall functioning at 5. (R. at 259.) That day, Ms. Muchai opined that despite his willingness to "learn new skills [of] conflict resolution," Plaintiff had made no progress. (257.)

On October 13, 2010, LaFonya Jones, M.A.P.C. (a doctoral intern supervised by Betty Eitel, Ph. D., a psychological consultant), interviewed Plaintiff and completed a psychological evaluation. (R. at 293–97.) Plaintiff told Dr. Jones and Dr. Eitel that during his manic episodes, he argued with his wife and brother, kicked the door, punched holes in the wall, and "felt unstoppable." (R. at 293.) He could go for three days without sleep, and when he did sleep, he slept for only three hours and had nightmares. (*Id.*) He squandered money, drove carelessly, ate all night long, started projects that he did not finish, and experienced "an excessive amount of racing thoughts." (*Id.*) These episodes lasted between two and three days. (*Id.*)

During Plaintiff's depressive episodes, which lasted between two to four days, he avoided people and tried to hurt himself. (R. at 293–94.) He experienced hypersomnia, decreased appetite, lethargy, and lack of motivation. (R. at 294.) He complained of feeling "worthless because he [was] no longer ... self-sufficient." (*Id.*) He could only control his anger with medications. (*Id.*) He was upset because his medication made him itchy, and he scratched excessively throughout the interview. (*Id.*) He reported symptoms of obsessive-compulsive disorder (OCD), but Dr. Jones opined that he did "not meet [the] full criteria" for an OCD diagnosis. (*Id.*)

Plaintiff did not drive and relied on others for transportation. (*Id.*) He could tell the time but

could not manage money.  (*Id.*)  He could cook, make his own doctor's appointments, use a phone book, do household chores, and groom independently.  (*Id.*)  Family members had to remind him of his doctors' appointments.  (*Id.*)  He liked being at home, eating, visiting with people (if it was a good day), and drawing.  (*Id.*)  He could not complete tasks due to his inability to focus. (*Id.*)  He had smoked one pack of cigarettes a day since age 11.  (R. at 295.)

Dr. Jones found that Plaintiff's hygiene and dress were appropriate.  (*Id.*)  He "had 41 tattoos."  (*Id.*)  He made average eye contact; built rapport easily; was pleasant and cooperative; had normal psychomotor activity, affect, and facial expressions; was irritable; had appropriate and logical thoughts and associations; and had no delusions, hallucinations, or unusual thoughts.  (R. at 296.)  Dr. Jones opined that his ability to encode and retain information appeared "slightly impaired", his concentration was "intact," and his abstract reasoning abilities appeared to be below the normal range.  (*Id.*)  Dr. Jones diagnosed him with bipolar disorder, I, most recent episode unspecified; polysubstance dependence, sustained full remission; nicotine dependence; and borderline personality disorder.  (*Id.*)  She assigned him a GAF score of 50, indicating severe problems with functioning.  (R. at 297.)  Her prognosis was guarded.  (*Id.*)  She concluded that "[w]ith treatment and medication, his bipolar disorder symptoms and borderline personality disorder may remit to some degree."  (*Id.*)  She opined that his overall level of functioning had "remained the same for several years and [was] unlikely to improve significantly without intervention[]."  (*Id.*)

During a consultation on October 13, 2010, Dr. Thiruvengadam opined that Plaintiff appeared neat and clean, his affect and speech were normal, and his mood was euthymic.  (R. at 254.)  Dr. Thiruvengadam rated Plaintiff's manic and depressive symptoms at 0, his level of interest, appetite, energy, and his level of functioning at 5, and the severity of his medications' side effects at 7.  (R. at 255.)  Plaintiff had no homicidal or suicidal ideations, insomnia, or anxiety.  (*Id.*)

Two days later, Plaintiff told Ms. Muchai that he stopped taking his medications because he continued to experience negative side effects.  (R. at 247.)  The following week, Ms. Muchai instructed him not to "buy[] Xanax from the street to manage [his] symptoms, especially now that he was on probation."  (R. at 246.)  Plaintiff explained that Xanax helped calmed him down and agreed to see Dr. Thiruvengadam to request a different prescription.  (*Id.*)

On October 29, 2010, Plaintiff told Dr. Thiruvengadam that he had insomnia, a decreased appetite, and racing thoughts.  (*Id.*)  Dr. Thiruvengadam noted that Plaintiff appeared neat and clean, his sensorium was clear, his affect and speech were normal, his thought processes and associations were logical and coherent, and his thought content was "normal."  (*Id.*)  Dr. Thiruvengadam rated his depressive symptoms at 1, his irritability and mood lability at 2, his agitation and insomnia at 3, his anxiety at 1, his interest, appetite, energy, and manic symptoms at 5, the severity of his medication side effects at 0, and his overall level of functioning at 5.  (R. at 245.)

On November 11, 2010, Plaintiff told Ms. Muchai that he was back on his medications and "was doing better now."  (R. at 243.)  Ms. Muchai opined that he was "making progress" with this anger management.  (*Id.*)  The following week, he stated that he did "not get angry as much now that he was learning the skills" of problem solving and conflict resolution.  (*Id.*)  Ms. Muchai opined that he was making "excellent progress."  (*Id.*)  By November 22, 2010, Plaintiff continued to make "excellent progress" and told Ms. Muchai that he "had started another medication for anxiety and [] the regimen he was on right now was working great."  (R. at 238.)

On November 16, 2010, Connie Benfield, Ph. D., a state agency medical consultant (SAMC) licensed in psychology, reviewed Plaintiff's evidence and completed a Psychiatric Review Technique Form (PRTF) and a mental Residual Functional Capacity (RFC) assessment.  (R. at 298–315.)  Dr. Benfield diagnosed Plaintiff with bipolar disorder I, most recent episode unspecified;

borderline personality disorder; and polysubstance dependence, sustained full remission.  (R. at 301, 305–06.)  In her PRTF, Dr. Benfield opined that Plaintiff had a mild restriction in activities of daily living, moderate restrictions in maintaining social functioning and maintaining concentration, persistence, or pace, and had experienced no episodes of decompensation of extended duration.  (R. at 308.)  Dr. Benfield referenced Dr. Jones's consultative findings and concluded that Plaintiff's "alleged limitations" were "not wholly supported" by the evidence and the impact of his symptoms did "not wholly compromise [his] ability to function independently, appropriately, and effectively on a sustained basis."  (R. at 310.)

In her RFC assessment, Dr. Benfield opined that Plaintiff was "not significantly limited" in 12 mental work-related abilities, including his ability to understand, remember, and carry out very short and simple instructions and make simple work-related decisions.  (R. at 312–13.)  She opined that Plaintiff was "moderately limited" in 8 mental abilities, including his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (*Id.*)  She concluded Plaintiff retained the mental RFC to understand, remember, and carry out complex instructions, make work-related decisions, concentrate for extended periods, sustain an ordinary work routine, and respond appropriately to changes in the workplace.  (R. at 314.)

On December 3, 2010, Plaintiff told Ms. Muchai that he was "doing great now."  (R. at 237.)  Ms. Muchai opined that he was "making progress" managing his anger.  (*Id.*)  Six days later, Plaintiff continued making "excellent progress," and he reported "doing great" and "considering [] reduc[ing] [his] services" at MHMR.  (R. at 236.)  By December 16, 2010, Plaintiff was still making "excellent progress," was "doing great," and still wanted to reduce his services with MHMR.  (R. at 340.)  The next day, he told Ms. Muchai he was "glad to be lowering his services" with MHMR.  (R. at 339.)  Ms. Muchai completed a "uniform assessment" and determined that Plaintiff's bipolar

disorder presented a "low" functional impairment.  (R. at 343.)

On December 29, 2010, Dr. Thiruvengadam completed another psychological evaluation. (R. at 345–49.)  Plaintiff told Dr. Thiruvengadam that during his depressive episodes, he engaged in "self-destruction", had suicidal thoughts, started fights, and experienced mood swings and insomnia.  (R. at 345.)  Plaintiff's current symptoms were decreased sleep, appetite, energy, libido, memory, and concentration,  anhedonia, and weight loss.  (*Id.*) Dr. Thiruvengadam found that his appearance was "fair", and he was appropriately dressed.  (R. at 347.)  He noted Plaintiff related easily and openly and was "pleasant," calm, cooperative, and withdrawn.  (*Id.*)  Plaintiff's body movements and speech were normal; his affect was depressed, manic, and sad; his thoughts were logical, clear, abstract, and concrete; his thought processes were goal oriented; and his thought content was self-destructive.  (*Id.*)  He was oriented to person, place, date, and situation.  (R. at 348.) Dr. Thiruvengadam assigned him a GAF score of 35[3] and noted that he was "doing well with [his] current med[ications]."  (*Id.*)

On January 21, 2011, Robert Gilliland, M.D., a SAMC licensed in psychiatry, reviewed Plaintiff's treatment notes and agreed with Dr. Benfield's consultative RFC assessment.  (R. at 316–18.)  He noted Plaintiff's statements to Ms. Muchai on November 22, 2010, and December 9, 2010, that he was "doing great" and his medication regimen was "working great."  (R. at 318.)  Dr. Gilliland opined that Plaintiff's allegations about his symptoms were "inconsistent" with treatment "notes indicating he [was] improving and following [his doctor's] orders."  (*Id.*)  He noted that Plaintiff  was "doing much better" after being taken off Lithium.  (*Id.*)

Dr. Thiruvengadam evaluated Plaintiff and completed a mental status report on February 23,

---

[3]  A GAF score of 31 to 40 indicates a "major impairment" in several areas, such as work or school, family relations, judgment, thinking, or mood.  *See Diagnostic & Statistical Manual of Mental Disorders* at 34.

2011.  (R. at 320–22.)  Dr. Thiruvengadam indicated that Plaintiff's grooming was "poor" and his psychomotor activity was "slow."  (R. at 320.)  He found Plaintiff had no spontaneous speech, was oriented to time, place, and person, showed symptoms of depression, and had a constricted affect.  (*Id.*)  He opined that Plaintiff's thought processes were normal; his thought content was limited; he had normal memory, attention, and concentration; and his insight and judgment were good.  (*Id.*)  Dr. Thiruvengadam found his prognosis to be poor.  (R. at 322.)   He opined that Plaintiff was "disabled" due to his mental illness and medication side effects, and that his ability to relate to others, sustain work, and respond to changes and stress in a work setting were "impaired."  (*Id.*)

During a treatment consultation that same day, Dr. Thiruvengadam found that Plaintiff was "doing well."  (R. at 329.)  He noted Plaintiff appeared "neat" and "clean," his sensorium was clear, his affect and speech were normal, his mood was euthymic, his thought processes and associations were logical and coherent, and his thought content was "normal."  (*Id.*)  He opined that Plaintiff had no symptoms of mania or depression.  (R. at 330.)  He rated Plaintiff's irritability, mood lability, agitation, anxiety, insomnia, and severity of medication side effects at 0, and his interest, appetite, energy, and overall functioning at 5.  (*Id.*)

On March 25, 2011, Plaintiff saw Ashley Franz-Davis, a "Routine Case Manager" at MHMR, for an "initial case management meeting."  (R. at 337.)  Plaintiff told her that he was "stabilized on [his] medications," was "finally at a good place," and was getting back together with his wife after a six-month separation.  (*Id.*)  Plaintiff "stated a willingness to be compliant" with his treatment and committed to keeping all of his appointments.  (R. at 337, 351.)

On June 1, 2011, Ms. Muchai met with Plaintiff and completed an evaluation.  (R. at 357–59.)  She opined that his strengths were his insight into his mental illness and need for treatment, his positive attitude, and his sense of humor.  (R. at 357.)  Plaintiff stated he "would like

to find a welding or similar job" and would complete at least three job applications within the next three months.  (R. at 358.)  He expressed an interest in MHMR's "supported employment" program.  (R. at 359.)  He still experienced bothersome side effects from his medications and requested a medication to "counteract" those effects.  (*Id.*)  Plaintiff told her he had difficulty controlling his anger, he yelled at family members and occasionally threatened them.  (*Id.*)  The Buspar "reduced the frequency of his panic attacks to approximately twice per week," but he was having "difficulty coping with [the] sexual side effects [it] caused."  (*Id.*)

On June 14, 2011, Dr. Thiruvengadam completed a "psychiatric/psychological impairment questionnaire."  (R. at 367–74.)  It stated that he first treated Plaintiff on December 29, 2010, and then saw him every six to eight weeks.  (R. at 367.)  He diagnosed Plaintiff with bipolar disorder, mixed, with psychosis, and assigned him a GAF score of 35.  (*Id.*)[4]  His prognosis was "poor."  (*Id.*)  Plaintiff's bipolar disorder was characterized by 14 clinical findings, including appetite, sleep, and mood disturbance, withdrawal or isolation,  hostility, and irritability.  (R. at 368.)  He further opined that Plaintiff's primary symptoms were mania, depression, and psychosis.  (R. at 369.)  He assessed Plaintiff's limitations in numerous work-related mental abilities and determined that Plaintiff had no limitation in 4 abilities,[5] mild limitations in 2 abilities,[6] moderate limitations in 2abilities,[7] and

---

[4]  A GAF score of 31–40 indicates "[s]ome impairment in reality testing or communication" or a "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood."  *Diagnostic & Statistical Manual of Mental Disorders*, at 34.

[5]  Remember locations and work-like procedures, understand and remember one or two step instructions, ask simple questions or request assistance, and be aware of normal hazards and take appropriate precautions.

[6]  Travel to unfamiliar places or use public transportation, and set realistic goals or make plans independently.

[7]  Make simple work related decisions and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.

- 10 -

marked limitations in 12 abilities.[8]  (R. at 370–71.)  In his comments, Dr. Thiruvengadam wrote that

Plaintiff "tried to attack [his] co-workers."  (R. at 372.)  According to the doctor, Plaintiff's

condition was ongoing, produced "good days" and "bad days," and was expected to last for more

than 12 months.  (R. at 373.)  He opined that Plaintiff could not work under "low stress" conditions

and would likely miss more than 3 days of work per month.  (R. at 373–74.)

### 4.   Hearing Testimony

On June 9, 2011, Plaintiff, his wife, and a Vocational Expert (VE) testified at a hearing

before the ALJ.  (R. at 24–68.)  Plaintiff was represented by an attorney.  (*Id.*)[9]

#### a.   Plaintiff's Testimony

Plaintiff testified that he last worked in August 2002 as a transloader for an oil company.

(R. at 41.)  He felt like he was "doing the job okay" and was "pretty good" at completing his tasks.

(R. at 46–47, 51.)  He did not have any problems with his coworkers in that job because he "was

pretty much on [his] own throughout the day."  (R. at 50.)  He argued with his supervisor, but then

they would "go [their] separate ways for a while."  (*Id.*)  During the six months he stayed on the job,

they only had one argument.  (R. at 54.)  He was never "written up" at work; they let him go only

after he "let them know" he was taking psychiatric medications.  (R. at 47.)  He had not looked for

---

[8]  Understand and remember detailed instructions, carry out simple one or two step instructions, carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance, sustain an ordinary routine without supervision, work in coordination with or proximity to others without being distracted by them, complete a normal workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting.

[9]  Counsel objected to the introduction of Dr. Jones's consultative examination and opinions on grounds that the opinions were not Dr. Eitel's opinions and were therefore not medical opinions.  (R. at 27.)  She also objected to the introduction of Dr. Benfield's consultative mental RFC, arguing that it was based on Dr. Jones's opinions rather than Dr. Eitel's.  (*Id.*)  The ALJ stated that he would take the counsel's objections "into consideration."  (R. at 28.)

work since then.  (*Id.*)  He was unable to work because of his medications' side effects, "as well as the aggravation from being bipolar."  (R. at 41–42.)

Plaintiff also worked as a welder.  (R. at 42.)  The longest job he had lasted one year, working for "Scott Equipment Company" as a rental clerk.  (*Id.*)  He also worked at Sears doing deliveries and sales, and at temporary agencies doing welding.  (*Id.*)  Except for his transloader job, he quit his jobs because of his bad temper; he would "snap and get violent."  (R. at 54.)

On average, Plaintiff felt "aggravated," threw things, yelled, and "usually end[ed] up pretty badly."  (R. at 47.)  He took medication and took "five minutes to the side" to control his anger.  (*Id.*)  His wife did not help him keep calm.  (*Id.*)

Plaintiff had three children, ages thirteen, four, and two.  (R. at 42.)  None of his children lived with him.  (*Id.*)  He lived with his wife and her four children.  (R. at 43.)  He had a driver's license but did not drive because his medications made him dizzy and drowsy.  (*Id.*)  His wife drove him to the hearing that day.  (*Id.*)

Plaintiff graduated from high school and attended vocational school to learn welding.  (R. at 44.)  Instead of a regular high school, however he was sent to "an alternative school" after he tried to attack the principal because he accused him robbing the high school gym.  (R. at 53.)

At MHMR, Plaintiff received treatment for his bipolar disorder with slight psychosis and anxiety.  (*Id.*)  He saw his psychiatrist once a month and his case manager twice a month.  (*Id.*)  The medication his psychiatrist prescribed him did not help him with his anger issues.  (R. at 55.)  His case manger "talked" about teaching him how to control his anger, but she did not help either.  (*Id.*)

Plaintiff took Zyprexa and Buspar, but his psychiatrist would soon change his Zyprexa because it made him lethargic, lowered his libido, and made it hard for him to "function."  (R. at 45.)  The Buspar he took for his anxiety and panic attacks made him dizzy and drowsy, and it caused him

difficulty in walking at times. (*Id.*) Before that, he was on Lithium and Tegretol. (*Id.*) His wife reminded him to take his medication. (R. at 46.) He never "ran out" of medication because his wife kept track of it. (*Id.*) During the time he and his wife were separated, his mother ensured he took his medications. (*Id.*) He was committed at age 18 for two weeks because he was suicidal. (*Id.*)

On a typical day, Plaintiff woke up around 11:30 a.m. or 12:00 p.m. (*Id.*) He took his medications, sat with the dog for about an hour, and went back to sleep for another four hours. (R. at 48.) His wife did all the household chores. (*Id.*) He never completed the tasks he started and "usually end[ed] up [having] an argument" with his wife. (*Id.*) He did not shower every day because some days he did not feel he needed it. (*Id.*) He could bathe and dress independently but needed to be reminded. (*Id.*) He went to bed around 9:30 or 10:00 p.m., and sometimes woke up due to heart burn. (R. at 49.) He ate once a day. (R. at 50.) When he was not on his medication, he experienced insomnia and slept only one or two nights a week. (R. at 56.)

Plaintiff's wife handled their finances because he was not good with money and spent "excessively." (R. at 50, 56.) He had no hobbies, was not involved in any group activities, and avoided grocery shopping because he was "not good with people." (R. at 50, 59.)

Plaintiff sometimes interacted with his step-children. (R. at 51.) He took them out, watched television and played video games with them, or just sat there and talked to them while they watched television. (*Id.*) They became a "little annoying" after 10 or 15 minutes. (*Id.*) He did not babysit them because they "aggravate[d] [him] too much." (*Id.*)

In the past, he enjoyed drawing pictures of demons. (R. at 51, 56.) He often had these "and other things that may be considered harmful" on his mind, even when he was on his medications. (R. at 56.) He had nightmares about four times a week. (R. at 57–58.) The night before the hearing, he dreamed that he tied all his children to a truck and dragged them around the yard. (R. at 57.) He

- 13 -

once dreamed he was a general in the holocaust and was in charge of turning on the furnaces.  (*Id.*)
Because of his aggressive nature, every time he visited his psychiatrist or therapist at MHMR, there
was "always someone standing outside the door" as a precaution.  (R. at 58.)

Plaintiff smoked half a pack of cigarettes per day and did not drink alcohol.  (R. at 51–52.)
The last time he had a drink was in 1997 or 1998.  (R. at 52.)  He stopped using illegal drugs in 2009
because he "[j]ust decided to be done with it."  (*Id.*)  He was currently on probation for drug-related
charges.  (*Id.*)

Plaintiff had panic attacks three or four times per month.  (R. at 59.)  When he told his
therapist at MHMR that he was "doing well", he meant that his medications were working properly.
(*Id.*)  On average, he had one "really good day" a month.  (*Id.*) The month before the hearing, he had
"three good days in a row."  (R. at 60.)  A good day for him meant "[n]ot being aggravated, not
wanting to be violent, not having the nightmares, and ... if [he] did have the nightmares, not
remember[ing] them."  (*Id.*)

### b.      *The Wife's Testimony*

Plaintiff's wife testified that they had been married for a year and a half and had known each
other for about four years.  (R. at 29.)  They lived apart from August 2010 to March 2011.  (*Id.*)
They separated because he "lost his temper, kicked the door in, and came after [her] to attack [her]."
(R. at 36.)  He had never been physically abusive but was verbally and mentally abusive.  (R. at 29.)
Plaintiff was "[v]ery aggressive," became "very angry," and yelled and screamed a lot.  (*Id.*)  His
mood was unpredictable; he was calm one moment and the next moment he was aggressive against
"everybody and everything."  (R. at 31.)  His medications did not help at all.  (R. at 37.)

Plaintiff was treated at MHMR and "heavily medicated."  (*Id.*)  His psychiatrist prescribed

him an antipsychotic drug to "calm him down a little bit for his bipolar disorder." (R. at 32.) He did not "open up a whole lot" when it came to sharing his thoughts. (*Id.*) When he did talk, he reported having "pretty alarming" dreams, such as "peeling" and eating his "brother's skin." (*Id.*)

Plaintiff showered three or four times a week, and his wife picked out his clothing. (R. at 33.) She also helped him with his grooming. (*Id.*) His mood was "pretty bad" on most days. (R. at 34.) His wife scheduled and drove him to all of his doctor's appointments. (*Id.*) She always accompanied him inside, except for the time when he saw "the Social Security doctor." (R. at 34–35.) Plaintiff went to therapy to correct his anger issues but it did not "really help a whole lot." (R. at 35.) He did not have any friends, and he visited with family members only when they came to see him. (R. at 36.)

Plaintiff was not allowed to see his youngest child because of his mental condition. (R. at 33.) Plaintiff was around her children only when she was around. (R. at 38.) She worked 55 hours a week. (*Id.*) He had worked "off and on" since they got married and last worked in August 2010. (*Id.*) They terminated him from that job because of his "mental instability." (R. at 39.) At the time, he was taking Lithium for his bipolar disorder and had serious side effects. (*Id.*) He slept "a lot" and his sleep pattern was "very erratic." (*Id.*) There were times that he did not sleep at all. (*Id.*)

      ***c.***     ***The VE's Testimony***

The VE testified that Plaintiff's past work history included jobs as a welder (medium, skilled, SVP-5 to 6), an equipment rental clerk (medium, semi-skilled, SVP-4), a laborer or transloader (heavy, unskilled, SVP-1 to 2), and temporary jobs (light to medium, unskilled, SVP-1). (R. at 61.) The ALJ asked the VE to opine whether a hypothetical person with Plaintiff's age, education, and work experience could perform his past relevant work with the following limitations: no exertional

limitations, simple, routine, and repetitive tasks, occasional "over-the-shoulder" type supervision, and occasional interaction with coworkers and the general public.[10] (R. at 61–62.) The VE testified that the hypothetical person could perform Plaintiff's past relevant work as a transloader. (R. at 63.)

In response to counsel's question, the VE explained that "over-the-shoulder," "occasional" supervision meant that the "supervisor would be standing by the person that [was] being supervised" for "[u]p to a third of the time." (*Id.*) The VE further testified that having a limited ability to maintain concentration and attention would not affect the person's ability to perform the transloader job because the job did not involve any problem-solving and consisted of "repetitively doing the same thing." (R. at 64.)

Counsel modified the hypothetical again to include the ability to maintain a routine only one third of the time. (*Id.*) The VE testified that the person's ability to work as a transloader would be negatively affected. (R. at 65.) After counsel added the limitation of having only "incidental contact" with coworkers, supervisors, and the public, the VE opined that the person could still perform the job of transloader. She identified Plaintiff's testimony that he worked "alone" as a transloader as the reason "why he was able to do the job for six months." (*Id.*)

When counsel added the limitation that the person be "unable to maintain regular attendance or [] be punctual within customary tolerances," the VE opined that the person's ability to perform the job would be negatively impacted. (*Id.*) The person's ability to perform any unskilled job would be affected with that limitation. (*Id.*) If the person was dizzy and drowsy due to medications between one to two thirds of the time, the VE opined that his ability to perform the job would

---

[10]   Upon counsel's inquiry, the ALJ explained that he "did not take" the RFC limitations he included in his hypothetical to the VE "from an Exhibit file." (R. at 63.)

"probably" be compromised.  (R. at 65–66.)  Lastly, if the person demonstrated "behavioral extremes" such as becoming angry one third of the time, his ability to work would also be negatively affected.  (R. at 66.)

## C.     ALJ's Findings

The ALJ denied Plaintiff's application for benefits by written opinion on July 29, 2011.  (R. at 13–23.)  At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of August 6, 2010.  (R. at 14.)  At step two, the ALJ found that Plaintiff's bipolar and anxiety disorders were severe impairments.  (*Id.*)  At step three, the ALJ determined that Plaintiff's impairments did not meet or medically equal any impairment listed in the regulations.  (*Id.*)

Before proceeding to step four, the ALJ determined that Plaintiff retained the following RFC: no exertional limitations, perform simple, routine, and repetitive tasks, occasional over-the-shoulder type supervision, work around coworkers throughout the day but have only occasional interaction with them, and have occasional interaction with the general public.  (R. at 21.)  At step four, based on the VE's testimony, the ALJ found that Plaintiff could perform his past relevant work as a transloader.  (R. at 22.)  Accordingly, the ALJ determined that Plaintiff was not disabled, as the term is defined under the Social Security Act, at any time between his alleged onset date of August 6, 2010, and the date of the ALJ's decision.  (R. at 22–23.)

## II.  ANALYSIS

## A.     Legal Standards

### 1.     Standard of Review

Judicial review of the Commissioner's denial of benefits is limited to whether the

Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence supports the Commissioner's decision. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343–44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id*. The Court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision. *See id*.

## 2.    Disability Determination

To be entitled to social security benefits, a claimant must prove he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing 20 C.F.R. § 404.1520(b)-(f)) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)).  Under the first four steps of the analysis, the burden lies with the claimant to prove disability.  *Leggett*, 67 F.3d at 564.  The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled.  *Id*.  Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show there is other gainful employment available in the national economy that the claimant is capable of performing.  *Greenspan*, 38 F.3d at 236.  This burden may be satisfied either by reference to the Medical-

Vocational Guidelines of the regulations, by vocational expert testimony, or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### 3.    Standard for Finding of Entitlement to Benefits

As an alternative to remand, Plaintiff asks the Court to reverse the Commissioner's decision "for an immediate award of benefits." (P. Br. at 19.)

When an ALJ's decision is not supported by substantial evidence, the case may be remanded "with the instruction to make an award if the record enables the court to determine definitively that the claimant is entitled to benefits." *Armstrong v. Astrue*, No. 1:08-CV-045-C, 2009 WL 3029772, at *10 (N.D. Tex. Sept. 22, 2009). The claimant must carry "the very high burden of establishing 'disability without any doubt.'" *Id.* at *11 (citation omitted). Inconsistencies and unresolved issues in the record preclude an immediate award of benefits. *Wells v. Barnhart*, 127 F. App'x 717, 718 (5th Cir. 2005) (per curiam). The Commissioner, not the court, resolves evidentiary conflicts. *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir. 2000).

### B.    Issues for Review

Plaintiff presents four issues for review:

(1)    [Plaintiff] is *Per Se* Disabled Under Medical Listing 12.04;

(2)    The ALJ Failed to Follow the Treating Physician Rule;

(3)    The ALJ Failed to Properly Evaluate [Plaintiff's] Credibility; [and]

(4)    The ALJ relied Upon Flawed Vocational Expert Testimony.

(Pl. Br. at 8, 10, 14, 17.)

C.      **Treating Physician Rule**[11]

Plaintiff contends that the ALJ erred by failing to give controlling weight to the opinions of Dr. Thiruvengadam, his treating psychiatrist, even though there was no competing first-hand evidence to controvert them, and the ALJ "rejected the opinions from all other medical sources in the record." (Pl. Br. at 11–12.)  He further argues that the ALJ erred in applying the factors listed in 20 C.F.R. §§ 404.1527(c)(2)–(6) and 416.927(c)(2)–(6) because he "mischaracterized the record when weighing Dr. Thiruvengadam's opinions." (*Id.* at 13–14.)  He contends that the ALJ's errors were not harmless and require remand because Dr. Thiruvengadam's opinions showed that his bipolar disorder was disabling.  (*Id.* at 14.)

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence. 20 C.F.R. §§ 404.1520b(b) and 404.1527(c) (2012). Every medical opinion is evaluated regardless of its source, but the Commissioner generally gives greater weight to opinions from a treating source. 20 C.F.R. § 404.1527(c)(1) (2012).   A treating source is a claimant's "physician, psychologist, or other acceptable medical source" who provides or has provided a claimant with medical treatment or evaluation, and who has, or has had, an ongoing treatment relationship with the claimant.  *Id.* § 404.1502.  When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. 20 C.F.R. § 404.1527(c)(2); *Newton* , 209 F.3d at 455.  If controlling weight is not given to a treating source's

---

[11]   Although Plaintiff lists and briefs this issue second, it is addressed first because its resolution impacts the resolution of her first issue.

opinion, the Commissioner applies six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion."   20 C.F.R. § 404.1527(c) (1)–(6).

While an ALJ should afford considerable weight to the opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton*, 209 F.3d at 455.  If evidence supports a contrary conclusion, an opinion of any physician may be rejected.  *Id.*  A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id.* at 455–56. Ordinarily, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [20 C.F.R. § 404.1527(c)]." *Id.* at 453 (emphasis in *Newton*). A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," or when the ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458.

Here, Dr. Thiruvengadam's treatment notes, February 23, 2011 mental status report, and June

14, 2011 impairment questionnaire were "treating source" statements for purposes of 20 C.F.R. § 404.1527(c).   *See* 20 C.F.R. § 404.1502.   In discussing his disability determination, the ALJ summarized Dr. Thiruvengadam's treatment notes from December 29, 2010.   (R. at 15, 345–49.) He accepted Dr. Thiruvengadam's observations that Plaintiff was pleasant, calm, and cooperative; had normal psychycomotor movements and speech; had a depressed and sad but also manic mood; had logical, clear, and goal-oriented thoughts; was oriented to person, place, date, and situation; had an intact memory; and had good concentration, insight, and judgment.   (R. at 15, 345–48.) He expressly rejected Dr.Thiruvengadam's GAF score of 35, which indicated Plaintiff had a major functional impairment, explaining that the score was "clearly based solely on [Plaintiff's] subjective complaints" since Dr. Thiruvengadam's actual observations of Plaintiff "were quite benign."   (R. at 16.)   The ALJ also gave "very little weight" to Dr. Thiruvengadam's opinions about the severity of Plaintiff's symptoms, explaining that he rendered them "after only one examination."   (*Id.*)

The ALJ could reject Dr. Thiruvengadam's GAF score of 35 without employing a factor-by-factor analysis if he found as a factual matter that it was contradicted by Dr. Thiruvengadam's observations of Plaintiff, which the ALJ accepted.   *See Berry v. Astrue*, No. 3:11-CV-02817-L BH, 2013 WL 524331, at *19 (N.D. Tex. Jan. 25, 2013), *rec. adopted*, 2013 WL 540587 (N.D. Tex. Feb. 13, 2013) (holding that the ALJ did not err in rejecting a treating physician's opinions about the claimant's "allegedly disabling back pain without performing a factor by factor analysis because there was competing first-hand medical evidence, including [the physician's] *own treatment record*, that supported a contrary conclusion") (citing *Newton*, 209 F.3d at 455) (emphasis added). Moreover, because the ALJ accepted  Dr. Thiruvengadam's personal observations of Plaintiff, his failure to note that Dr. Thiruvengadam treated Plaintiff at least three times before he rendered these

opinions was harmless error, since he would have reached the same disability determination if he had acknowledged those prior consultations.[12]  *See McNeal v. Colvin*, No. 3:11-CV-02612-BH-L, 2013 WL 1285472, at *27 (N.D. Tex. Mar. 28, 2013) (applying harmless error analysis to the ALJ's improper evaluation of treating opinion); *Bornette v. Barnhart*, 466 F. Supp. 2d 811, 816 (E.D. Tex. 2006) (in the Fifth Circuit, harmless error exists when it is inconceivable that a different administrative conclusion would have been reached absent the error) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)).[13]

The ALJ next acknowledged but "afforded very little weight" to Dr. Thiruvengadam's mental status report from February 23, 2011, because it conflicted with his own treatment notes from that same day.  (R. at 16, 320–22.)  Dr. Thiruvengadam's report indicated that Plaintiff's grooming was "poor" and his psychomotor activity was "slow."  (R. at 320.)  His consultation notes from that same day stated that Plaintiff's appearance was "neat and clean."  (R. at 329.)  While Dr. Thiruvengadam's report stated that Plaintiff's mood was depressed and he had a "constricted affect" (R. at 320), his consultation notes reflected that Plaintiff's mood was euthymic and that he showed *no symptoms of depression or mania* (R. at 329–30).  His report stated that Plaintiff was "disabled" due to his mental illness and medication side effects, such as drowsiness, and that his prognosis was "poor."  (R. at 322.)  His consultation notes stated that Plaintiff was "doing well," his sensorium was clear, his thought processes and associations were logical and coherent, and his thought content was normal.  (R. at 329.)  Dr. Thiruvengadam rated Plaintiff's mania, depression, psychosis, irritability,

---

[12]  Notably, in his June 14, 2011 questionnaire, Dr. Thiruvengadam wrote that he first treated Plaintiff on December 29, 2010.  (*See* R. at 367.)

[13]  Because a GAF score is only a diagnostic tool, courts have held that no particular GAF score "necessarily correlates" to specific limitations imposed by a claimant's mental impairments.  *See Bobinger v. Astrue*, No. 1:09–CV–103–C, 2011 WL 1085265, at *5 (N.D. Tex. Mar. 24, 2011).

mood lability, agitation, anxiety, insomnia, and "overall side effect severity" at 0.  (R. at 330.)

The ALJ could reject Dr. Thiruvengadam's opinion that Plaintiff was "disabled" due to his bipolar disorder and medication side effects because a determination of disability is not a medical opinion, but rather a legal conclusion that is reserved to the Commissioner.   20 C.F.R. § 404.1527(e); *Frank*, 326 F.3d at 620. He could also reject Dr. Thiruvengadam's "poor" prognosis without performing a factor-by-factor analysis because there was competing first-hand medical evidence, i.e., his own treatment notes from the same day, that supported a contrary conclusion. *See Newton*, 209 F.3d at 455; *Berry*, 2013 WL 524331, at *19.

Lastly, the ALJ's narrative discussion summarized but gave "very little weight" to Dr. Thiruvengadam's June 14, 2011 "psychiatric/psychological impairment questionnaire"[14] rather than controlling weight because he found that it conflicted with other evidence in the record, including Dr. Thiruvengadam's own treatment notes.  (R. at 17–18, 367–74.)  He then proceeded to analyze the questionnaire using the factors listed in 20 C.F.R. § 404.1527(c) (1)–(6).  (*See id.*)

---

[14]  In his questionnaire, Dr. Thiruvengadam diagnosed Plaintiff with bipolar disorder, mixed, with psychosis. (R. at 367.) He assigned Plaintiff a GAF score of 35, and stated that his prognosis was "poor." (*Id.*) He indicated that Plaintiff manifested 14 "clinical findings" that supported Dr. Thiruvengadam's diagnosis, including appetite and sleep disturbance, personality change, and difficulty thinking or concentrating. (R. at 368.) He opined that Plaintiff had no limitations in four mental work-related abilities: remember locations and work-like procedures, understand and remember one or two step instructions, ask simple questions or request assistance, and be aware of normal hazards and take appropriate precautions. (R. at 370–72.) Plaintiff had mild limitations in two abilities: travel to unfamiliar places or use public transportation and set realistic goals or make plans independently. (*Id.*) Plaintiff had moderate limitations in two abilities: make simple work related decisions and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (R. at 370–71.) Lastly, he opined that Plaintiff had marked limitations in 12 abilities: understand and remember detailed instructions, carry out simple one or two step instructions, carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerance, sustain an ordinary routine without supervision, work in coordination with or proximity to others without being distracted by them, complete a normal workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods, interact appropriately with the general public, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and respond appropriately to changes in the work setting. (*Id.*) He wrote that Plaintiff had "tried to attack [his] coworkers" and was incapable or tolerating even "low stress" at work. (R. at 372–73.)

As to factors (c)(1)–(2)(i) (examining and treatment relationship), the ALJ incorrectly stated that Dr. Thiruvengadam treated Plaintiff on only two occasions. (R. at 17–18.) Nevertheless, earlier in his discussion, the ALJ summarized and accepted Dr. Thiruvengadam's findings in his initial consultation on August 20, 2010, and a follow-up consultation on October 1, 2010, which showed Plaintiff was doing well.[15]  The ALJ would have reached the same disability determination even if he had credited these additional consultations to Dr. Thiruvengadam.  Accordingly, any error in applying this factor was harmless.  *See Bornette*, 466 F. Supp. 2d at 816.

With regard to factor (c)(2)(ii) (the nature and extent of the treatment relationship), the ALJ remarked that Dr. Thiruvengadam's treatment notes consisted of Plaintiff's "subjective complaints" and Dr. Thiruvengadam's objective observations of Plaintiff, assessment of the severity of his symptoms, and prescriptions for psychotropic medication. (R. at 18; *see also* R. at 254–56, 258–59, 263–64, 345–49, 320–22, 329, 367–74.)

As to factor (c)(3) (supportability), the ALJ determined that Dr. Thiruvengadam's GAF score of 35 was unsupported by the objective medical evidence.  (R. at 17.)  He rejected Dr. Thiruvengadam's questionnaire in its entirety, explaining that "no treating or examining physician," including Dr. Thiruvengadam, had "reported observing symptoms upon actual examination ... as severe as" those that Dr. Thiruvengadam indicated in his questionnaire.  (*Id.*)  The record supported at least some of Dr. Thiruvengadam's responses in the questionnaire, however. For instance, Dr. Thiruvengadam indicated that Plaintiff's bipolar disorder was characterized by 14 "clinical

---

[15]  On August 20, 2010, Dr. Thiruvengadam opined that Plaintiff "had a normal appearance, clear sensorium, normal affect, normal speech, euthymic mood, and normal thought processes and content."  (R. at 14, 263.)  On October 1, 2010, Dr. Thiruvengadam's noted that Plaintiff had "less than moderate symptoms of mania, depression, irritability, mood lability, and agitation with scores of 3 each" on a 10-point scale and that he had "moderate changes in his level of interest and energy" and "reported ... significant changes in his appetite."  (R. at 14, 264.)

findings," including sleep disturbance, mood disturbance, emotional lability, anhedonia, social

isolation, decreased energy, manic symptoms, and hostility and irritability, and he opined that this

disorder resulted in "good days" and "bad days." (R. at 367–68, 373.) Plaintiff's and his wife's

testimony supported these opinions. (*See* R. at 28–63.) Moreover, on several occasions, Plaintiff

complained to treating professionals that he experienced anger, insomnia, social withdrawal,

irritability, and racing thoughts. (*See, e.g.*, R. at 244, 265–69, 270–78.) More than once, Ms.

Muchai opined that he was making "little progress" in managing his anger. (*See* R. at 257, 260.)

In her October 13, 2010 evaluation, Dr. Jones stated that her prognosis was "guarded," and she

opined that Plaintiff's bipolar symptoms "may remit to some degree" with treatment and medication,

but that his overall functioning was "unlikely to improve significantly without intervention." (R.

at 297.)

   Even though the ALJ did not account for this evidence supporting Dr. Thiruvengadam's

questionnaire, he concluded that Plaintiff's bipolar and anxiety disorders caused him "moderate

limitations in his social functioning, concentration, persistence, and pace, and [] therefore limited

him to simple, routine, and repetitive tasks" with only occasional supervision and interaction with

coworkers and the public. (R. at 22.) Any error by part of the ALJ in failing to address the evidence

that supported Dr. Thiruvengadam's responses was harmless since he would have reached the same

disability conclusion had he acknowledged it. *See Bornette*, 466 F. Supp. 2d at 816.

   Under factor (c)(4), "consistency", the ALJ determined that Dr. Thiruvengadam's statement

that he saw Plaintiff every six to eight weeks was contradicted by his notation on his February 23,

2011 consultation notes that Plaintiff was to return in eight to twelve weeks. (R. at 17, 330, 367.)

He found that Dr. Thiruvengadam's statements that Plaintiff "tried to attack his coworkers" and that

he prescribed Plaintiff Haldol and Depakote were unsubstantiated by the evidence of record.  (R. at 17, 367.)  The ALJ rejected all of Dr. Thiruvengadam's answers in his questionnaire, finding that they were "completely inconsistent" with the record as a whole, including Plaintiff's "subjective reports of improvement" and his reduction of services at MHMR.  (R. at 18.)

While some of Dr. Thiruvengadam's responses were consistent with some evidence, the majority of his responses, including his opinion that Plaintiff had marked limitations in 12 mental abilities, conflicted with other evidence in the record.  On November 11, 2010, Plaintiff told Ms. Muchai that he "was doing much better now" that he was back on his medications, and she opined that he was making "excellent progress."  (R. at 243.)  Twelve days later, Plaintiff told her that he was taking a different medication for anxiety and  the "regimen he was on [currently] was working great."  (R. at 238.)  After reviewing this, and all the other evidence in the record, Dr. Benfield, a SAMC, opined that Plaintiff was "not significantly limited" in 12 mental work-related abilities[16] and was "moderately limited" in 8 abilities.[17]  (*See* R. at 312–13.)  Most of Dr. Benfield's opinions conflicted with Dr. Thiravengadam's finding that Plaintiff was markedly limited in 12 abilities.  (*See* R. at 370–71.)  In her "uniform assessment" from December 17, 2010,  Ms. Muchai opined that Plaintiff's bipolar disorder presented a "low" functional impairment.  (R. at 343.)

By December 3, 2010, Plaintiff was still "doing great," was making "excellent progress," and even considered reducing his services with MHMR.  (R. at 236.)  By December 16, he continued

---

[16]  These included his ability to understand, remember, and carry out very short and simple instructions, as well as detailed instructions, and make simple work-related decisions.  (*See* R. at 312.)

[17]  These included Plaintiff's ability to work in coordination with or proximity to others without being distracted by them, interact appropriately with the general public, respond appropriately to criticism from supervisors, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes.  (*See* R. at 312–13.)

making excellent progress.  (R. at 340.)  The next day, he told Ms. Muchai he was "glad to be lowering his services" with MHMR.  (R. at 339.)  On January 21, 2011, Dr. Gilliland, another SAMC, reviewed Plaintiff's treatment record and agreed with Dr. Benfield's consultative assessment.  (R. at 316–183.)  During his February 23, 2011 consultation, Dr. Thiruvengadam opined that Plaintiff was "doing well," had a clear sensorium, his affect and speech were normal, his thought processes and associations were logical and coherent, and his thought content was normal.  (R. at 329.)  He found that Plaintiff had no symptoms of mania or depression, and he rated his irritability, mood lability, agitation, anxiety, insomnia, and overall severity of his medication side effects at 0.  (R. at 330.)  As the trier of fact, the ALJ was entitled to weigh and reject the opinions of Dr. Thiruvengadam that he found to be inconsistent with the record.  *See Taylor v. Apfel*, 228 F.3d 409 (5th Cir. 2000) ("The ALJ may reject the opinion of any physician, including the treating doctors, if the evidence supports a contrary conclusion or is not adequately supported by the record as a whole."); *Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991) ("The ALJ as factfinder has the sole responsibility for weighing the evidence and may choose whichever physician's diagnosis is most supported by the record.").

Under factor (c)(5) (specialization), the ALJ acknowledged Dr. Thiruvengadam's practice in psychiatry, and under factor (c)(6), he remarked that Dr. Thiruvengadam did not appear to have "any understanding of the Social Security disability programs and [their] evidentiary requirements, as he ha[d] rendered an opinion [that] was completely unsupported by his own treatment records" and by "the evidence as a whole."  (R. at 18.)

Despite the ALJ's oversights, his narrative discussion shows that he properly considered the relevant factors and found good cause for giving "very little wight" to Dr. Thiruvengadam's

questionnaire.  Because substantial evidence supports the ALJ's analysis of Dr. Thiruvengadam's

opinions, remand is not required on this issue.  *See Zimmerman v. Astrue*, 288 F. App'x 931, 935

(5th Cir. 2008) (affirming the ALJ's rejection of a treating physician's opinion where the ALJ cited

the factors listed in 20 C.F.R. § 404.1527(c) "and his discussion demonstrate[d] that he *considered*

*several of the factors*") (emphasis added).

### D.   RFC Determination[18]

Plaintiff also argues that the ALJ erred in assessing his RFC because he rejected every

medical opinion of record.  (R. at 14.)  He argues, in essence, that he suffered prejudice as a result

of the ALJ's "impermissible lay interpretation of the record" because it led to an unsupported RFC

and a defective hypothetical to the VE.  (*Id.* at 14, 18.)[19]

Residual functional capacity, or RFC, is defined as the most that a person can still do despite

recognized limitations.  20 C.F.R. § 404.1545(a)(1) (2003).  It "is an assessment of an individual's

ability to do sustained work-related physical and mental activities in a work setting on a regular and

continuing basis."  Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2,

1996).  An individual's RFC should be based on all of the relevant evidence in the case record,

including opinions submitted by treating physicians or other acceptable medical sources.  20 C.F.R.

§ 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1.

The ALJ "is responsible for assessing the medical evidence and determining the claimant's

residual functional capacity."  *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).  The ALJ may

---

[18]   Although Plaintiff briefs this issue as part of his treating physician rule issue (*see* Pl. Br. at 14), it is addressed separately because it involves a different analysis.

[19]   Although Plaintiff lists and briefs separately the issue relating to "flawed vocational expert testimony," it is addressed together with his RFC argument because it relates to the question of whether the ALJ's rejection of "every medical opinion in the record" prejudiced his claim.

find that a claimant has no limitation or restriction as to a functional capacity when there is no allegation of a physical or mental limitation or restriction regarding that capacity, and no information in the record indicates that such a limitation or restriction exists. *See* SSR 96-8p, 1996 WL 374184, at *1. The ALJ's RFC decision can be supported by substantial evidence even if she does not specifically discuss all the evidence that supports her decision or all the evidence that she rejected. *Falco v. Shalala*, 27 F.3d 16, 164 (5th Cir. 1994). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564.

Nevertheless, the substantial evidence review is not an uncritical "rubber stamp" and requires "more than a search for evidence supporting the [Commissioner's] findings." *Martin v. Heckler*, 748 F.2d 1027, 1031 (5th Cir. 1984) (citations omitted). The Court "must scrutinize the record and take into account whatever fairly detracts from the substantiality of the evidence supporting the" ALJ's decision. *Id.* Courts may not reweigh the evidence or substitute their judgment for that of the Commissioner, however, and a "no substantial evidence" finding is appropriate only if there is a "conspicuous absence of credible choices" or "no contrary medical evidence". *See Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988) (per curiam) (citations omitted).

As discussed, the ALJ rejected Dr. Thiruvengadam's December 29, 2011 GAF score of 35, his February 23, 2011 mental status report, and his June 14, 2011 questionnaire in determining Plaintiff's RFC. The ALJ also rejected Dr. Benfield's and Dr. Gilliland's consultative opinions. (R. at 22.) He explained that these consultants "did not provide a rationale and findings of fact" and that their opinions were "rendered without the benefit of personally observing [Plaintiff] and reviewing all of the pertinent evidence, and were wholly conclusory and unsupported." (*Id.*) Dr.

Benfield had determined that Plaintiff could understand, remember, and carry out complex instructions, make work-related decisions, concentrate for extended periods, sustain an ordinary work routine, and respond appropriately to changes in the workplace. (R. at 314.) She did not impose any social restrictions. (*See* R. at 312–14.) After referencing Dr. Jones's consultative examination, Dr. Benfield had concluded that Plaintiff's allegations were not wholly supported by the evidence of record. (R. at 310.) On January 21, 2011, Dr. Gilliland agreed with Dr. Benfield's findings. (R. at 316–18.) Dr. Gilliland pointed to Plaintiff's statements to Ms. Muchai in November and December 2010 that he was "doing great" and his medications were "working great." (*Id.*) The ALJ also rejected Dr. Jones's October 13, 2010 diagnosis of personality disorder, remarking that Dr. Thiravengadam, Plaintiff's "treating psychiatrist," had "never diagnosed" such a condition. (R. at 15, 296.) Likewise, he rejected Dr. Jones's GAF score of 50, which indicated that Plaintiff had severe problems with functioning, explaining that "in light of the completely benign objective clinical findings upon [Dr. Jones's] examination," the GAF score was "inappropriately based on [Plaintiff's] subjective complaints." (R. at 15, 297.)

The ALJ considered important Plaintiff's testimony that "in his job as a transloader, where he was able to work alone, he did quite well and was never the subject of any disciplinary action." (R. at 21, 46–47, 50.) Earlier in his decision, the ALJ referenced Plaintiff's statement to Ms. Muchai that he was "doing great now" and was considering "reducing the MHMR therapy services." (R. at 15, 236.) "Viewing the evidence as a whole," the ALJ concluded that it was "clear that [Plaintiff] ha[d] experienced good results from his psychiatric treatment and that he and his wife ha[d] greatly exaggerated both the nature and the severity of his subjective complaints." (R. at 21.) Based on these conclusions, the ALJ determined that Plaintiff retained the following RFC: no exertional

limitations, perform simple, routine, and repetitive tasks, occasional over-the-shoulder type supervision, work "around coworkers throughout the day" but have only occasional interaction with them, and have only occasional interaction with the general public. (R. at 21.) The ALJ concluded, given his RFC finding and Plaintiff's and the VE's testimony, that Plaintiff could perform his past relevant work of transloader and was therefore not disabled. (R. at 22–23.)

The ALJ's narrative discussion reflects that he rejected every medical opinion regarding the effects of Plaintiff's bipolar and anxiety disorders and the side effects of the medications he took for these conditions on his ability to work. Although the absence of a medical source statement describing the types of work that a claimant is still capable of performing despite his impairments does not make the record incomplete, "evidence describing the claimant's medical conditions is insufficient to support an RFC determination." *Moreno v. Astrue*, 5:09-CV-123-BG, 2010 WL 3025525, at *3 (N.D. Tex. June 30, 2010), *rec. adopted*, 2010 WL 3025519 (N.D. Tex. Aug. 3, 2010) (citing *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995)); *see also Williams v. Astrue*, 355 Fed. App'x 828, 832 n. 6 (5th Cir. 2009) ("In *Ripley*, we held that an ALJ may not—without opinions from medical experts—derive the applicant's residual functional capacity based solely on the evidence of his or her claimed medical conditions. Thus, an ALJ may not rely on his own unsupported opinion as to the limitations presented by the applicant's medical conditions."). The ALJ therefore "impermissibly relied on [his] own medical opinions" to determine the effects that Plaintiff's impairments and medication side effects had on his ability to work.[20] *See Williams*, 355 Fed. App'x at 832.

Nevertheless, because "[p]rocedural perfection in administrative proceedings is not required"

---

[20] Notably, upon counsel's inquiry, the ALJ stated that he did not base his RFC on any "[e]xhibit file" in the record. (R. at 63.)

and a court "will not vacate a judgment unless the substantial rights of a party are affected," Plaintiff must show that he was prejudiced by the ALJ's failure to rely on medical opinion evidence in assessing his RFC. *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (per curiam). "Procedural errors in the disability determination process are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision." *McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 837 (N.D. Tex. 2008) (citing *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988)). To establish prejudice, Plaintiff must show that the ALJ's failure to rely on medical opinion evidence in assessing his RFC casts doubt onto the existence of substantial evidence supporting his disability determination. *See Bornette*, 466 F. Supp. 2d at 816; *see also Newton*, 209 F.3d at 458.

On March 25, 2011, Plaintiff told Ms. Franz-Davis, a case manager at MHMR, that he still experienced negative side effects and needed another medication because he "would like to *not sleep all day*." (R. at 337) (emphasis added). By June 1, 2011, the last treatment session on file, Plaintiff complained to Ms. Muchai of bothersome side effects and requested a medication to "counteract" the side effects of his current prescriptions. (R. at 359.) Prior to that, Plaintiff had complained of negative side effects on numerous occasions. (*See, e.g.*, R. at 247, 293, 325.) Also on June 1, 2011, he told Ms. Muchai that he was depressed, his anger persisted, and he yelled at and threatened family members. (R. at 360.) At the hearing, Plaintiff testified that his Zyprexa made him feel lethargic, and it was difficult for him to function. (R. at 45.) The Buspar he took for his anxiety made him dizzy and drowsy and caused him difficulty in walking at times. (*Id.*) He testified that he could not drive, much less work, due to his medications' side effects. (R. at 41–43.) He also testified that he was terminated from his job as a transloader after he "let them know" about the

medications he was taking.  (R. at 47.)  Plaintiff's wife testified that he was "heavily medicated" for

his bipolar disorder and slept "a lot."  (R. at 39.)  On October 13, 2010, Dr. Thiruvengadam rated

the severity of the medications' side effects at 7 on a 10-point scale.  (R. at 255.)  In response to

counsel's question, the VE testified that if the hypothetical person was lethargic, dizzy, and drowsy

due to medications between one to two thirds of the time, his ability to perform the transloader job

would "probably" be negatively affected.  (R. at 66.)  She testified that these conditions would

"probably" render the person unable to perform any unskilled work.  (*Id.*)

The ALJ was required to consider all of the relevant evidence in the record, including the

effect that Plaintiff's medications had on his ability to work.  *See Crowley v. Apfel*, 197 F.3d 194,

199 (5th Cir. 1999) ("Under the regulations, the Commissioner is required to consider the 'type,

dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to

alleviate [ ] pain or other symptoms'") (citing 20 C.F.R. § 404.1529(c)(3)(iv)) (alterations in

*Crowley*).  Instead of doing so, the ALJ discounted Plaintiff's statements regarding his medications'

side effects by noting that Dr. Thiravengadam indicated in his questionnaire that he prescribed

Plaintiff "unspecified amounts of Haldol and Depakote ... medications reportedly effective when

taken as prescribed with *no side effects* reflected in [Dr. Thiravengadam's] treatment records."  (R.

at 20) (emphasis added).  The ALJ had previously rejected Dr. Thiravengadam's statement that he

prescribed Plaintiff Haldol and Depakote on grounds that there were "no accompanying treatment

notes clarifying this", however.  (R. at 17.)  He had also rejected Dr. Thiruvengadam's opinion from

February 23, 2011, that Plaintiff could not work because his medications made him dizzy and

drowsy.  (R. at , 16, 322.)

"[T]he ALJ ... cannot 'pick and choose' only the evidence that supports his position."  *Loza*

*v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) (citations omitted).  As a result of his failure to consider the evidence concerning the side effects of Plaintiff's medications and to obtain a medical source opinion regarding the impact of those side effects on his ability to work casts doubt , the ALJ did not consider whether greater limitations were warranted in reaching his RFC assessment.  Given the amount of evidence in the record of those effects, he could have reached a different result.  Accordingly, the ALJ's rejection of every medical opinion when determining Plaintiff's RFC prejudiced Plaintiff's claim.  *See Pennington v. Astrue*, No. CIV. A. H-08-3616, 2010 WL 648413, at *22 (S.D. Tex. Feb. 23, 2010) (holding that the ALJ's failure to address "the ample evidence regarding the negative side effects of [the] Plaintiff's medications" when determining her RFC was "clearly prejudicial" because "he might have reached a different result" "had he properly considered [that] evidence") (citing *Newton*, 209 F.3d at 453; *Ripley,* 67 F.3d at 557 n. 22); *see also Moreno*, 2010 WL 3025525, at *3.[21]  Remand is therefore warranted on this issue.

## III.   RECOMMENDATION

Plaintiff's motion should be **GRANTED in part**, Defendant's motion should be **DENIED**, and the case should be **REMANDED** to the Commissioner for further proceedings.

**SO RECOMMENDED**, on this 6th day of September, 2013.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

---

[21]  Because the ALJ's proper determination of Plaintiff's RFC on remand will affect Plaintiff's remaining issues, these are not addressed.

- 36 -

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

- 37 -